COURT OF APPEALS OF VIRGINIA

Present: Judges Russell, AtLee and Senior Judge Haley

UNPUBLISHED

ANGEL LEE PARKS

v.      Record No. 1106-19-3

GILES COUNTY DEPARTMENT
  OF SOCIAL SERVICES

MEMORANDUM OPINION[*]
PER CURIAM
JANUARY 28, 2020

FROM THE CIRCUIT COURT OF GILES COUNTY
Robert M. D. Turk, Judge

(Brian S. Scheid; Warren and Scheid, P.C., on brief), for appellant.
Appellant submitting on brief.

(Richard L. Chidester, County Attorney; M. Corbin Vierling,
Guardian *ad litem* for the minor children, on brief), for appellee.
Appellee and Guardian *ad litem* submitting on brief.

Angel Lee Parks (mother) appeals the circuit court orders terminating her parental rights to

two of her children and approving the foster care goal of adoption. Mother argues that the circuit

court erred by finding that there was sufficient evidence to terminate mother's parental rights under

Code § 16.1-283(C)(2) and (E)(i). Mother also asserts that the circuit court erred by approving the

foster care goal of adoption because the circuit court erred in terminating her parental rights. Upon

reviewing the record and briefs of the parties, we conclude that the circuit court did not err.

Accordingly, we affirm the decision of the circuit court.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." Yafi v. Stafford Dep't of Soc. Servs., 69 Va. App. 539, 550-51 (2018) (quoting Thach v. Arlington Cty. Dep't of Human Servs., 63 Va. App. 157, 168 (2014)).

Mother and Gerald Wall (father) are the biological parents to the two children who are the subject of this appeal.[2] The Department removed the two children from their parents' care on November 21, 2017, due to concerns about mother's mental health, father's anger issues, and allegations of physical abuse against the children. At the time of removal, the children were four years old and almost two years old.

The Department required the parents to work with a parenting coach, participate in counseling, complete anger management and parenting classes, participate in a psychological and parenting capacity evaluation, submit to an attachment assessment, and attend supervised visitations. The parents participated in all of the services, but never made any measurable progress.

Sharon Brammer, a licensed professional counselor and attachment consultant, conducted attachment assessments with the children, mother, and father. Brammer explained that "[a]ttachment is a bond that is form[ed], particularly with the primary caregivers beginning at

---

[1] The record in this case was sealed. Nevertheless, the appeal necessitates unsealing relevant portions of the record to resolve the issues appellant has raised. Evidence and factual findings below that are necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." Levick v. MacDougall, 294 Va. 283, 288 n.1 (2017).

[2] The circuit court also entered orders terminating father's parental rights under Code § 16.1-283(C)(2) and approving the foster care goal of adoption. Father appealed the circuit court's ruling. See Wall v. Giles Cty. Dep't of Soc. Servs., Record No. 1072-19-3.

birth or even before birth, and continues to form, particularly during the first two years." Attachment can affect a child's relationships with peers, teachers, and others, as well as affect their ability "to function in school," "to feel safe," and "to trust the world." After interviewing mother and observing her with the children, Brammer concluded that mother had a "disordered or disorganized attachment," and because of childhood abuse and trauma, mother did not "have the capability to securely attach to her children." Brammer recommended that mother participate in intensive therapy to address her "significant trauma history" and anger management therapy. Brammer also recommended therapy to address mother's attachment disorder, once she was "psychologically stable" and not showing any anger management issues; however, Brammer cautioned that mother's cognitive limitations may limit her ability to engage in attachment disorder therapy. Based on Brammer's recommendations, the Department attempted to provide the parents with bonding sessions, but "could not find anyone that would do the bonding sessions based on the results of the evaluation."

Mother questioned Brammer's conclusions and testified that she had bonded with the children "before they were born." She explained that she had taught the children the alphabet and colors, took them to doctor's appointments, and cared for them since birth.

In addition to seeing Brammer, mother met with Dr. Klaire Mundy, a licensed clinical psychologist, who attempted to conduct a psychological and parenting capacity evaluation on mother. On the day of the evaluation, mother was "extremely verbose, disrespectful, verbally aggressive, [and] cursing" Dr. Mundy and her staff. Mother had a very difficult time following directions and staying on task. Dr. Mundy ended the session before all aspects of the evaluation

- 3 -

were completed because mother was "so emotionally discontrolled" that she was unable to finish all of the tasks.[3]

Dr. Mundy later called mother to determine whether she was coming to father's appointment because Dr. Mundy had some additional documents for her to sign. Mother "screamed and cursed and ultimately hung up on" Dr. Mundy. Although mother came to father's appointment, she was "very hostile, belligerent, angry, [and] agitated." Mother screamed and cursed at Dr. Mundy, and at one point, Dr. Mundy was "quite concerned" about mother becoming physically violent. Father tried to calm mother down and encouraged her to leave the office.[4]

Dr. Mundy did not produce an evaluation for mother because she could not generate an unbiased professional report due to mother's behaviors and the "emotional distress" mother caused. Dr. Mundy testified that mother had "no impulse control or frustration tolerance and she has no insight into how she interacts with the world around her or how her behavior impacts others." Dr. Mundy also expressed "extreme concerns" about "what happen[ed] behind closed doors at home" when the parents were "so aggressive and so threatening" and "unable to maintain themselves in a professional setting."

In addition to referring the parents for evaluations, the Department offered them supervised weekly visitations. The Department expanded the visits to four-hour community visits, but the parents never progressed to overnight visits. The parents struggled to manage the children's behaviors when the visits were longer. The social worker described the visits as "very

---

[3] Mother disagreed with Dr. Mundy's testimony. When asked how the appointment went, mother testified that "everything went fine" and that Dr. Mundy "never acted like she was afraid of [mother] or anything like that."

[4] Mother testified that she was asleep in the truck during father's appointment.

- 4 -

chaotic" and noticed that the children interacted more with her, the visitation supervisor, and the parenting coach than the parents.

After each visit, the parenting coach met with the parents to discuss what she observed and how they could improve. Mother rejected any suggestions and was argumentative. If mother disagreed with the parenting coach, she "exploded," regardless of whether they were in a public place or whether the children were present.

The Department also provided counseling services for the children to help them learn coping skills and manage their emotions. Amber Carbaugh, a licensed professional counselor, met with the children weekly. Mother appeared unannounced at one of the children's counseling appointments and demanded to be included in the children's treatment. Carbaugh described mother as "very aggressive" and noticed that the oldest child appeared scared. Mother was asked to leave.

In October 2018, the Department filed petitions to terminate mother's and father's parental rights and change the foster care goal to adoption. On January 30, 2019, the Giles County Juvenile and Domestic Relations District Court (the JDR court) terminated mother's and father's parental rights and approved the foster care goal of adoption. The parents appealed the JDR court rulings.

The parties appeared before the circuit court on March 22 and June 7, 2019. Mother acknowledged that her parental rights previously had been terminated for an older child.[5] The Department conceded that there was no question regarding the parents' ability to provide shelter, food, and clothing. The Department argued that the issue was whether the parents had made any progress toward addressing the issues that caused the children to come into foster care.

---

[5] See Parks v. Wythe Cty. Dep't of Soc. Servs., No. 2039-07-3 (Va. Ct. App. Aug. 26, 2008).

The Department presented evidence about the children's welfare. The parents' visitations with the children stopped once the JDR court terminated their parental rights; thereafter, the children's behaviors and physical health improved. Both children stopped throwing tantrums. They became more talkative and outgoing. The social worker described the children as "completely different" and happier. When the children entered foster care, both were "substantially overweight," but at the time of the circuit court hearing, neither child was overweight. The parenting coach noted that the parents did not teach the children "the most basic level social skills," such as saying "please" and "thank you," but they learned these skills and more, such as how to take responsibility for their actions, in foster care.

The social worker and parenting coach testified that they had provided all available services to no avail and that no other services were available to assist mother and father. The parenting coach found that the parents "have a lot of struggles with communication and they are not able to provide the emotional support that a child would need or the stability." The parents did not make any measurable progress during the twenty-five months that the Department provided them with services.

Mother testified that she did not want the court to terminate her parental rights. She denied abusing or neglecting the children. Mother blamed the Department for taking her children under false pretenses and thought that most of the Department's witnesses did not testify truthfully. Mother acknowledged that she had mental health issues, but stated that she took all her prescribed medications. Mother also admitted to getting angry and saying "stupid things" to the social workers. She apologized to the court for raising her voice during a portion of her testimony, and told the circuit court that she found the proceedings "a little agitating."[6]

---

[6] Mother left the hearing at one point after announcing that she could not "handle this no more." She later returned to the courtroom.

Mother's psychiatrist testified that mother was diagnosed with bipolar disorder, type II and had paranoid ideation. Her mental health problems began when she was eight years old with her first hospitalization.[7] At the time of the circuit court hearing, the psychiatrist opined that mother was stable and compliant with her medications. The psychiatrist testified that mother had expressed frustration and anger with the legal system and the Department; however, she had never expressed any homicidal or suicidal ideations.

After hearing all of the evidence and arguments, the circuit court found that it was in the best interests of the children to terminate mother's parental rights. On June 7, 2019, the circuit court entered orders terminating mother's parental rights under Code § 16.1-283(C)(2) and (E)(i) and approving the foster care goal of adoption. This appeal followed.

ANALYSIS

Mother argues that the circuit court erred by terminating her parental rights under Code § 16.1-283(C)(2) and (E)(i). "On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20 (1986)).

A parent's parental rights may be terminated "if the court finds, based upon clear and convincing evidence, that it is in the best interests of the child and that (i) the residual parental rights of the parent regarding a sibling of the child have previously been involuntarily terminated

---

[7] Mother was hospitalized once while the children were in foster care.

. . . ." Code § 16.1-283(E)(i). Mother concedes that her parental rights to a sibling of the children previously had been involuntarily terminated. Here, she argues that the circuit court erred by finding that it was in the best interests of the children to terminate her parental rights. Mother emphasizes that the Department stipulated that she could provide the necessary food, shelter, and clothing for the children, and her psychiatrist testified that she was stable and compliant with her medication.

"'[T]here is no simple, mechanical, cut and dried way' to apply the best interests of the child standard." Bristol Dep't of Soc. Servs. v. Welch, 64 Va. App. 34, 48 (2014) (quoting Peple v. Peple, 5 Va. App. 414, 422 (1988)). "Instead, 'the question must be resolved . . . in light of the facts of each case.'" Id. (quoting Toombs v. Lynchburg Div. of Soc. Servs., 223 Va. 225, 230 (1982)).

The Department presented evidence that mother had not progressed in her ability to parent the children despite all of the services provided to her. Brammer testified about mother's attachment issues, which the circuit court found to be "real concerns," especially since they "probably cannot be resolved." Mother had a temper and was often belligerent with the service providers. She rejected suggestions from the parenting coach. The Department presented evidence that the children's behaviors and physical health improved after they stopped visiting their parents. The children learned social skills, became more engaged, and were happier. The circuit court found that mother was unable to meet the children's mental and developmental needs.

Mother asked the circuit court for more time and services, but the circuit court noted that the children already had been in foster care for "almost two years . . . with services being provided and . . . we're still in the same spot we were when we began." The circuit court emphasized its "obligation to stop and to put some permanency and stability in [the children's]

lives." The circuit court informed mother that it could not let the children "dangle" while it gave her another chance. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Tackett v. Arlington Cty. Dep't of Human Servs., 62 Va. App. 296, 322 (2013) (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540 (1990)). Contrary to mother's arguments, the circuit court did not err in terminating her parental rights under Code § 16.1-283(E)(i) and finding that termination of her parental rights was in the best interests of the children.

In addition to terminating mother's parental rights under Code § 16.1-283(E)(i), the circuit court terminated mother's parental rights under Code § 16.1-283(C)(2). "When a trial court's judgment is made on alternative grounds, we need only consider whether any one of the alternatives is sufficient to sustain the judgment of the trial court, and if so, we need not address the other grounds." Kilby v. Culpeper Cty. Dep't of Soc. Servs., 55 Va. App. 106, 108 n.1 (2009); see also Fields v. Dinwiddie Cty. Dep't of Soc. Servs., 46 Va. App. 1, 8 (2005) (the Court affirmed termination of parental rights under one subsection of Code § 16.1-283 and did not need to address termination of parental rights pursuant to another subsection). Therefore, we will not consider whether the circuit court erred in terminating mother's parental rights pursuant to Code § 16.1-283(C)(2).

With respect to mother's challenge of the foster care goal of adoption, "[o]ur decision to affirm the termination order necessarily subsumes this aspect of [her] appeal because a preponderance-of-the-evidence standard governs judicial modifications of foster care plans." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 265 n.3 (2005).

## CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

<u>Affirmed.</u>